UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GUY GECHT, *et al.*, <br><br> Defendants. <br><br> and <br><br> ELECTRONICS FOR IMAGING, INC., a Delaware Corporation <br><br> Nominal Defendant. | No. C-06-7453 EMC <br><br><br> **ORDER DENYING PLAINTIFF'S MOTION TO REMAND** <br><br> **(Docket No. 7)** |

Having considered the parties' briefing and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** Plaintiff City of Ann Arbor Employees' Retirement System's motion to remand. The Court also **DENIES** Plaintiff's request for attorney's fees pursuant to 28 U.S.C. § 1447(c).

### I. FACTUAL & PROCEDURAL BACKGROUND

Plaintiff, a retirement system for employees of the City of Ann Arbor, is a shareholder of a company by the name of Electronics for Imaging, Inc. ("EFI"). Plaintiff filed a derivative suit and class action against various officers and directors of EFI, alleging, *inter alia*, that Defendants breached their fiduciary duty by failing to disclose in EFI's 2006 proxy statement their practice of backdating stock options to their benefit and to shareholders' detriment. EFI's 2006 proxy statement sought shareholder approval for (a) amendments to the 2004 Equity Incentive Plan and (b) an

amendment to the 2000 Employee Stock Purchase Plan.  *See* Compl. ¶ 43; *see also* Ignacio Decl. ISO Mot. to Dismiss, Ex. A (2006 proxy statement).  One of the amendments to the 2004 Equity Incentive Plan was to increase the number of shares of common stock authorized for issuance thereunder by an aggregate 4.5 million shares.  The amendment to the 2000 Employee Stock Purchase Plan was to extend and increase a provision providing an automatic share increase in the number of shares authorized for issuance from 2006 through 2012.  *See* Compl. ¶ 1.  The complaint alleges that the proxy solicitations were misleading because they did not disclose that, from at least 1996 through 2003, the Board improperly back-dated options to certain current or former directors, senior officers, and other employees in violation of previously shareholder approved stock option plans.  *See id.* ¶ 2.  The thrust of Plaintiff's complaint is that "[a] shareholder who knew that Company executives backdated options granted under prior plans (thereby providing not only improper compensation to EFI directors and employees but also artificially inflating net income and rendering certain tax deductions unavailable) would not have voted in favor of expanding the Compensation Committee's ability to issue stock options under the 2004 Plan or other forms of compensation under the 2000 Employee Stock Purchase Plan."  Compl. ¶ 56.

Plaintiff initially filed suit in state court on November 22, 2006.  Before Plaintiff could serve the summons and complaint on any of the Defendants in the case, one of the Defendants -- namely, Thomas Unterberg -- made a general appearance in state court on December 5, 2006, and promptly removed to federal court on the same day.  *See* Barry Decl., Exs. C-D.  Plaintiff has moved to remand the case back to state court.

## II. DISCUSSION

Mr. Unterberg argues that removal is appropriate in the instant case pursuant to the removal provision of the Securities Litigation Uniform Standards Act ("SLUSA"), as well as the general removal statute.  *See* 28 U.S.C. § 1441(b).  There is a strong presumption against removal jurisdiction.  Mr. Unterberg has the burden of establishing that removal is proper.  *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

2

A. <u>SLUSA</u>

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") to curtail perceived abuses of the class-action vehicle in litigation involving nationally traded securities. *See Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 126 S.Ct. 1503, 1510 (2006). Among other things, the PSLRA imposed heightened pleading requirements in actions brought pursuant to § 10(b) of the Securities Exchange Act of 1934 and Rule 10-b(5). *See id.* at 1511. However, the PSLRA

> had an unintended consequence. It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare. To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, Congress enacted SLUSA.

*Id.*

The core provision of SLUSA is as follows:

> (1) Class action limitations. No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
>
> (2) Removal of covered class actions. Any covered class action in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(2). In short, SLUSA provides for the removal and preemption of certain securities class actions filed in state court. However, certain types of class actions are exempted

3

1  under SLUSA if based on the statutory or common law of the issuer's state of incorporation.  *See* 15
2  U.S.C. § 78bb(f)(3).  The exemptions are known as the Delaware carve-outs.
3        In its motion to remand, Plaintiff does not dispute that its class action -- the first cause of
4  action in its complaint -- falls within the scope of SLUSA.  Plaintiff's only contention is that its class
5  action cannot be removed or preempted pursuant to SLUSA because the class action is covered by
6  one of the Delaware carve-outs, namely, the second carve-out.[1]  *See also Greaves v. McAuley*, 264
7  F. Supp. 2d 1078, 1085 (N.D. Ga. 2003) ("Once a 'covered class action' has been removed to a
8  federal court, if the Delaware carve-out applies, the federal court is required to 'remand such action'.
9  . . . to state court.").
10       Under the second Delaware carve-out, a class action is exempt from SLUSA's removal and
11 preemption rules

> if it involves--
>
>     . . . .
>
>   (II)  any recommendation, position, or other communication with respect to the sale of securities of an issuer that --
>
>       (aa)  is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and
>
>       (bb)  concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

20 *Id.* § 78bb(f)(3)(A)(ii). According to Plaintiff, its class action "involve[s] 'recommendations' or
21 'communications with respect to the sale of securities of an issuer' because EFI was requesting
22 shareholder approval to increase the amount of authorized EFI shares and transfer certain of these
23 shares under certain stock option plans." Mot. at 9.  Plaintiff continues that "the communications
24 were made 'by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities'
25 because EFI made the communications to EFI shareholders." *Id.*  Finally, Plaintiffs asserts that "the

---

[1] The Court acknowledges that, in opposition to Mr. Unterberg's motion to dismiss, Plaintiff claims that both Delaware carve-outs are applicable.  However, because Plaintiff failed to raise the applicability of the first carve-out in its motion to remand, the Court addresses only the second carve-out.

4

communications involved 'decisions of such equity holders with respect to voting their securities' because EFI asked its shareholders to vote their securities to increase the authorized shares and increase the stock options." *Id.*

In opposition to the motion to remand, Mr. Unterberg argues that the above carve-out does not apply to Plaintiff's class action because the Supreme Court indicated in *Merrill Lynch* that SLUSA is intended to have a broad preemptive/removal effect. *See Merrill Lynch*, 126 S. Ct. at 1513 (stating that "Congress envisioned a broad construction [of SLUSA]" and that "[a] narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act"). However, *Merrill Lynch* is of limited support to Mr. Unterberg's position since, as Plaintiff points out, it does not directly address the scope of the Delaware carve-outs, and in particular, the second carve-out.

Mr. Unterberg further argues that the second Delaware carve-out is not applicable in the instant case because it "is limited to misrepresentations made in connection with proposed mergers or acquisitions." Opp'n at 11. But, as Plaintiff points out, the carve-out contains no such restriction. In fact, the carve-out expressly states that exempted class actions are those that involve communications with respect to the sale of securities that concern decisions of equity holders with respect to voting their securities *or* acting in response to a tender or exchange offer *or* exercising dissenters' or appraisal rights. *See* 15 U.S.C. § 78bb(f)(3). The statute's use of the disjunctive negates Mr. Unterberg's narrow interpretation of the carve-out. Furthermore, courts have applied the carve-out outside the context of a merger or acquisition. *See, e.g.*, *In re Metlife Demutualization Litig.*, No. CV 00-2258 (TCP) (AKT), 2006 U.S. Dist. LEXIS 60104, at *21 (E.D.N.Y. Aug. 7, 2006) (finding that second Delaware carve-out applied in case involving reorganization).

Finally, Mr. Unterberg contends that the second Delaware carve-out is not applicable because Plaintiff has not alleged that the shareholder vote at issue was sufficiently related to the sale of securities. *See* Opp'n at 12. Mr. Unterberg does not dispute that the act of granting stock options constitutes the sale of securities. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129-30 (9th Cir. 2002) ("The grant of an employee stock option on a covered security is . . . a 'sale' of that covered security."). Rather, according to Mr. Unterberg, the problem for Plaintiff is that, in the 2006 proxy statement, Defendants did not seek shareholder approval for the actual granting of stock options.

Instead, Defendants sought, *inter alia*, approval to increase the shares *authorized* for issuance under the 2004 Equity Incentive Plan. The question therefore, as posed by Mr. Unterberg, boils down to whether a proxy statement seeking authorization for issuance of more stock options, rather than authorization of actual grant of options, is related enough to constitute a communication "with respect to" the sale of securities of an issuer.

Resolution of this issue turns on the phrase "with respect to" as used in the second Delaware carve-out. There is no case law addressing the interpretation of "with respect to," but there are cases addressing the interpretation of the similar phrase "in connection with" (as used in SLUSA), and neither party has pointed to any provision in SLUSA, its legislative history, or case law suggesting that Congress's use of the two different phrases was intended to imply a difference in scope. Certainly there is nothing obvious or inherent in the plain meaning of these phrases that would so suggest. Accordingly, the Court finds the construction of the phrase "in connection with" given by the Supreme Court and the Ninth Circuit persuasive in interpreting "with respect to."[2]

In *Merrill Lynch*, the Supreme Court held that, in determining whether an alleged fraud is "in connection with" a purchase or sale of securities so as to trigger the application of SLUSA, "it is enough that the fraud alleged 'coincide' with a securities transaction." *Merrill Lynch*, 126 S.Ct. at 1513. The Ninth Circuit has similarly held that, pursuant to SLUSA, a fraud is "in connection with" a securities transaction if it "coincides" with the transaction or is "more than tangentially related." *Falkowski*, 309 F.3d at 1130-1131.

In *Falkowski*, the Ninth Circuit held that state law fraud claims relating to employee stock options were preempted by SLUSA because the alleged fraud took place "in connection with the purchase or sale of a covered security." *See Falkowski*, 309 F.3d at 1126. The court explained first that the granting of a stock option is a "purchase or sale" of a security for purposes of SLUSA: "The option is a contractual duty to sell security at a later date for a sum of money, should the employee

---

[2] While it may be argued that the policy of applying SLUSA broadly could imply the threshold requisites for SLUSA should be more liberally construed than the carve-out, there is a countervailing concern, apparently reflected in the Delaware carve-out, that the legislation should not be construed so as to foster the federalization of corporate law. *Cf. Ketchum v. Green*, 557 F.2d 1022, 1029 (3d Cir. 1977). In any event, Mr. Unterberg has failed to cite any authority for imparting different definitions here.

choose to buy it out. Whether or not the employee ever exercises the option, it is a 'sale' under Congress's definition." *Id.* at 1130. The court then concluded that the alleged fraud was sufficiently related to the contract to sell stock to meet the "in connection with" requirement.

> The claim that defendant concealed [an] impending accounting write-off sufficiently alleges fraud "in connection" with a contract to sell [company] shares because it involves a misrepresentation about the value of the options. The claim that defendants concealed their plan to force early exercise of the options is also sufficient because it relates to the time period during which the Employees could exercise their rights to purchase. These allegations both "coincide" with the securities transaction and area easily characterized as having "more than some tangential relation to" the securities themselves.

*Id.* at 1131.

While the Ninth Circuit has not further elaborated on what constitutes "more than tangentially related," it has held -- consistent with *Merrill Lynch* -- that the meaning of "in connection with" in the context of § 10(b) and Rule 10b-5 claims is instructive in construing SLUSA. *See id.* at 1129; *see also Merrill Lynch*, 126 S.Ct. at 1513 (looking to how the Supreme Court has construed "in connection with" in the § 10(b) and 10b-5 context); *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 877-78 (8th Cir. 2006) ("constru[ing] the phrase 'in connection with the purchase or sale of a covered security' as used in SLUSA by looking to interpretations of identical language used in § 10(b) of the Securities Exchange Act of 1934 and in Securities and Exchange Commission (SEC) Rule 10b-5"); *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1100 (N.D. Cal. 2005) (taking note of the above standard in *Falkowski* and also noting that, in a case dealing with § 10(b) and 10b-5 claims, the Supreme Court concluded that there is a connection between an alleged fraud and a securities transaction where the fraudulent scheme and securities transaction "'coincide'"). Thus, cases which address the "in connection with" requirement of § 10(b) and Rule 10(b)-5 are illuminating to the issue at bar.

In *In re Financial Corporation of America Shareholder Litigation*, 796 F.2d 1126 (9th Cir. 1986), the Ninth Circuit held that, in the context of § 10(b),

> [o]ne factor to be considered in determining whether the "in connection with" requirement has been met is whether a causal connection between the fraud and the transaction has been shown.

7

> *Boffo v. Graddick*, 742 F.2d 592, 596 (11th Cir. 1984) (*citing Ketchum v. Green*, 557 F.2d 1022, 1025-30 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L. Ed. 2d 300 (1977). This "transactional nexus requirement is a species of causation [in fact]. Consistent with § 10(b)'s 'in connection with' limitation on liability, it prohibits claims based on the extremely attenuated links between plaintiff's injury and defendant's conduct [as alleged]." *Hudson v. Capital Management International, Inc.*, 565 F. Supp. 615, 622 (N.D. Cal 1983).

*Id.* at 1130.

In *Ketchum*, cited by the Ninth Circuit, the Third Circuit amplified the analysis of the nexus required to satisfy the "in connection with" requirement, holding that the "connection" element of § 10(b) concerns "the degree of proximity" between the securities transaction and the claimed fraud. *Ketchum*, 557 F.2d at 1028. The court gave as an example the "fairly tight linkage" in the Supreme Court's decision in *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6 (1971), where the misrepresentation "was only one step removed" from the bond transaction and the transaction was "undertaken for the purpose of making possible the practices alleged to be deceptive." *Ketchum*, 557 F.2d at 1028.

Here, there is more than a "tangential" relationship between Defendants' allegedly fraudulent communications to shareholders and the prospective sale of securities at issue (*i.e.*, stock option grants).[3] *Falkowski*, 309 F.3d at 1130-31. The authorization sought by the allegedly misleading proxy statement has a "transactional nexus" with any further option grants. *In re Financial Corp. of Am. Shareholder Litig.*, 796 F.2d at 1130. The shareholder authorization was a necessary predicate to any further grants of backdated options, options contemplated by the complaint.[4] The complaint

---

[3] Although not briefed by either party, the fact that the allegedly misleading communication concerned past sale of securities (backdated options granted in 1996-2003) makes this case somewhat unique. Plaintiff alleges that these misleading disclosures and omissions about these grants were "essential links" in obtaining shareholder approval. It could therefore be argued that, at least *retrospectively*, the misleading proxy solicitation literally constituted a "communication with respect to the sale of securities" which was made by the issuer to shareholders and which concerned shareholder decisions with respect to voting their securities. However, in light of the Court's holding herein, this issue need not be resolved.

[4] The complaint alleges that the Board is controlled by Defendants, *see* Compl. ¶ 71, and that Defendants "improperly extracted from the public shareholders a portion of the economic value and voting power of the public shareholder's shares and redistributed the economic value and voting power to themselves and to the EFI employees under their control." *Id.* ¶ 19. The complaint seeks a preliminary and permanent injunction barring issuance of any shares of common stock pursuant to the

1 fairly implies the purpose of the misleading proxy solicitation was to facilitate further backdated 2 options. There is thus clear causal connection between the proxy statement and the anticipated 3 transaction.

4 Moreover, there is a high degree of proximity in the causal chain. Defendants would not 5 need to make any further communications with shareholders before granting the options: no further 6 shareholder approval is necessary once the authorization was obtained. The proxy statement was the 7 last necessary "communication with respect to the sale of securities" which concerns "decision of 8 such equity holders with respect to voting their securities." *Compare Superintendent of Ins. v.* 9 *Bankers Life & Casualty Co.*, 404 U.S. 6 (1971) (case in which the misrepresentation in obtaining 10 shareholder authorization was only one step away from the granting of the options), *with Ketchum*, 11 557 F.2d at 1028 (noting that "there are a substantial number of intermediate steps between the fraud 12 and the accomplishment of the forced sale of plaintiffs' shares: the shareholders' vote subsequent to 13 the misrepresentation; the ensuing meeting of the company directorate during which the plaintiffs 14 were removed as officers; and the adoption of the resolution terminating the plaintiffs' status as 15 company employees."). *See also Brown v. Ivie*, 661 F.2d 62, 65-66 (5th Cir. 1981) (finding causal 16 connection where defendants fraudulently induced plaintiff to sign agreement requiring him to sell 17 stock at less than fair value upon termination and where, after obtaining agreement, defendants 18 terminated plaintiff); *Dalicandro v. Legalgard, Inc.*, No. 99-3778, 2000 U.S. Dist. LEXIS 3089, at 19 *8-9 (E.D. Pa. Mar. 16, 2000) (finding a sufficient connection where there was only one 20 intermediate step between the fraud and the sale of stock).

21 The Court notes that, at the hearing on the motion to remand, it asked the parties to comment 22 on the relevance of *Wilson v. First Houston Inv. Corp.*, 566 F.2d 1235 (5th Cir. 1978). There, the

---

exercise of backdated options or the granting of any options under the 2004 Equity Incentive Plan. *See id.* ¶ 113. The complaint thus fairly implies the proxy solicitation intended to facilitate further grants of improper stock options. *See Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 391 (S.D.N.Y. 2006) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315, 1318 (S.D. Miss. 2003) ("When considering a motion to remand the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Clancy v. Bay Area Bank*, Nos. C97-0077 FMS, C96-4376 FMS, 1997 U.S. Dist. LEXIS 4914, at *9 (N.D. Cal. Apr. 7, 1997) ("Because a motion to remand is analogous to a motion to dismiss, the Court accepts the allegations of plaintiff's complaint as true.").

9

plaintiff filed a 10b-5 suit against his investment advisor, arguing that the transfer of control over his stock portfolio to the advisor satisfied the requirement that the alleged fraud be "in connection with the purchase and sale of securities." The Fifth Circuit concluded that "any purchase and sale which took place incident to this arrangement was too remote to satisfy the 'in connection with the purchase and sale' requirement as contemplated by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)." *Id.* at 1243. Given *Wilson*, it could be argued that, in the instant case, the mere authorization for issuance of more stock options is too remote or speculative to satisfy the requirement that the recommendation, position, or communication be "with respect to the sale of securities."

The Court, however, finds *Wilson* inapposite. First, *Wilson* is in tension with the more recent Supreme Court decision *Merrill Lynch* and its progeny which have construed "in connection with." Also, at least one district court has found *Wilson* unconvincing because it does not contain a substantive analysis of the required "connection" for a 10b-5 claim. *See In re Catanella & E.F. Hutton & Co., Sec. Litigation*, 583 F. Supp. 1388, 1411 & n.32 (E.D. Pa. 1984) ("Without analysis, the [*Wilson*] court simply declared the fraud too remote from the transactions. Thus, *Wilson* lends little guidance."). More important, *Wilson* is factually distinguishable. In contrast to the general transfer of authority at issue in *Wilson*, here, it is alleged that the proxy solicitation was directly related to the option grants: shareholder authorization was a necessary predicate to further option grants and was intended to facilitate such grants, and it was only one step away from any further grants. *See also Ambassador Hotel v. Wei-Chuan Inv.*, 189 F.3d 1017 (9th Cir. 1999) (finding a sufficient connection where the fraudulent solicitation concerned a joint venture agreement that did not mention stock but gave the newly formed corporation the ability to later issue stock).

Accordingly, the Court concludes that Mr. Unterberg's attempt to remove pursuant to SLUSA was not justified because Plaintiff's class action falls within the scope of the second Delaware carve-out.

B.     28 U.S.C. § 1441(b)

Although the Court concludes that removal pursuant to SLUSA was not warranted, Mr. Unterberg has articulated another basis for removal pursuant to 28 U.S.C. § 1441(b).

There is no dispute that Plaintiff could have filed suit in federal court based on diversity jurisdiction. Plaintiff is a citizen of Michigan and none of the Defendants are citizens of Michigan. Plaintiff, however, chose to file suit in state court. The question is whether removal under 28 U.S.C. § 1441(b) is proper.

Under 28 U.S.C. § 1441(b), a case in which the parties are completely diverse "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). Thus, in the instant case, if any Defendant who is properly joined and served were a citizen of California, the case would not be removed. The parties agree that at least some of the Defendants in this case -- including nominal Defendant EFI -- are citizens of California. However, none of these California Defendants had been served at the time of removal. Mr. Unterberg argues, therefore, that removal is proper because he is the only Defendant served (by virtue of his entering a general appearance) in the case, and he is not a citizen of California.

Plaintiff asserts that the strict language of § 1441(b) should not be applied to the instant case because doing so would not serve the purpose of § 1441(b) and in fact would reward gamesmanship on the part of Mr. Unterberg and the other Defendants. Plaintiff relies on *Holmstrom v. Harad*, No. 05 C 2714, 2005 U.S. Dist. LEXIS 16694 (N.D. Ill. Aug. 11, 2005) in which the district court explained:

> The purpose of the 'joined and served' requirement is to prevent a plaintiff from blocking removal by joining as a defendant a resident party *against whom it does not intend to proceed*, and whom it does not even serve. Defendants are entitled to act to remove a case based on circumstances at the time they are sued, and are not required to guess whether a named resident defendant will ever be served.

*Id.* at *6 (emphasis added).

In the instant case, there is no dispute that all of the California Defendants named in the case are parties against whom Plaintiff does intend to proceed. Indeed, for the derivative suit, Plaintiff must proceed against EFI, a citizen of California. As in *Holmstrom*, the apparent purpose of the "joined and served" requirement is not served here. In fact, Mr. Unterberg, not Plaintiff, engaged in gamesmanship by acting preemptively to remove before Plaintiff effectuated service on the

11

1  California Defendants (in particular, EFI).  The gamesmanship by the Defendants, according to
2  Plaintiff, is especially clear from the fact that, in one of the cases which was related to the instant
3  case, *see* Case No. 06-7274, *all* of the California Defendants made appearances, not just Mr.
4  Unterberg, even though the same counsel represents those Defendants as well as Mr. Unterberg.
5  The decision to have only Mr. Unterberg enter an appearance in this case was deliberate.

6  Plaintiff's argument is not without merit -- indeed, has a great deal of appeal.  The difficulty
7  for Plaintiff is that the language of § 1441(b) is clear, and a court may depart from the plain
8  language of a statute only under "rare and exceptional circumstances."  *Demarest v. Manspeaker*,
9  498 U.S. 184, 190, (1991) ("When we find the terms of a statute unambiguous, judicial inquiry is
10 complete except in rare and exceptional circumstances."), *superseded by statutory amendment on*
11 *other grounds*, 28 U.S.C.A. § 1821.  A court "look[s] beyond the express language of a statute
12 where a literal interpretation would thwart the purpose of the overall statutory scheme or lead to an
13 absurd or futile result."  *Albertson's, Inc. v. Commissioner of Internal Revenue*, 42 F.3d 537, 545
14 (9th Cir. 1994) (internal quotation marks omitted).

15 The Court cannot say that, in the instant case, strict adherence to the language of § 1441(b)
16 would lead to absurd or futile results.  Plaintiff suggests that rewarding Mr. Unterberg's
17 gamesmanship would render an absurd result.  However, the Court notes that the gamesmanship of
18 Mr. Unterberg is somewhat overstated.  Mr. Unterberg did not make a general appearance and
19 remove the case to federal court until approximately two weeks after Plaintiff filed the complaint.
20 Plaintiff therefore had an opportunity to serve the complaint on any of the California Defendants,
21 including the corporate defendants.  Plaintiff should have been cognizant of the fact that a
22 nonresident defendant could remove a case without having been served.  *See Delgado v. Shell Oil*
23 *Co.*, 231 F.3d 165, 177 (5th Cir. 2000) ("Generally, service of process is not an absolute prerequisite
24 to removal.").

25 Plaintiff points out that, "even when the plain meaning did not produce absurd results but
26 merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' [the
27 Supreme Court] has followed that purpose, rather than the literal words."  *United States v. American*
28 *Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (finding that a literal interpretation of the Motor Carrier

Act would give the Commission power to make employment decisions that were broader than intended by Congress); *see also Albertson's*, 42 F.3d at 537. Even under the *American Trucking* standard, the Court cannot conclude that strict adherence to the language of § 1441(b) would be plainly at variance with the policy behind the statute. While *Holmstrom* articulates a logical analysis of the purpose of the joined and served requirement, if Congress had wanted to ensure that removal would not be appropriate until it was clear that Plaintiff was trying to prevent removal by speciously naming resident defendants, Congress could have provided that no removal petition could be filed until one or more nonresident defendant had been joined and served. The statute also could have been written to give a plaintiff, *e.g.*, 30 or 60 days to effect service before permitting a defendant to remove. In any event, Plaintiff has not cited anything in the legislative history of § 1441(b) to support its assertion that the plain language of the statute should be disregarded. And, significantly, *Holmstrom's* decision to disregard the plain language of § 1441(b) has been disapproved by other courts. *See Massey v. Cassens & Sons, Inc.*, No. 05-CV-598-DRH, 2006 U.S. Dist. LEXIS 9675, at *10 (S.D. Ill. Feb. 16, 2006) ("While an argument can be made that the likely policy underlying the 'joined-and-served' requirement is not implicated by the current facts, the Court is constrained by the language of 28 U.S.C. § 1441. That language is clear and unambiguous: where complete diversity is present -- as it is in this case -- only the presence of a 'joined-and-served' resident defendant defeats removal."); *see also Davis v. Cash*, No. 3:01-CV-1037-H, 2001 U.S. Dist. LEXIS 15546 (N.D. Tex. Sept. 27, 2001) (granting removal where individual nonresident defendant entered a general appearance by filing an answer before any defendants had been served).

Finally, whether Mr. Unterberg had been "served" by virtue of his voluntary general appearance in state court, Cal. Code Civ. Proc. § 410.50(a) (providing that "[a] general appearance by a party is equivalent to personal service of summons on such party"), is immaterial. Procedurally, Mr. Unterberg could remove whether or not he had been "served." *See Delgado*, 231 F.3d at 177 (5th Cir. 2000) ("Generally, service of process is not an absolute prerequisite to removal."); *Massey,* 2006 U.S. Dist. LEXIS 9675, at *6 ("Nothing in 28 U.S.C. § 1441 or any other statute requires defendants to have been served themselves prior to removing a case to federal court"). Substantively, § 1441(b)'s "joined and served" requirement focuses on resident defendants,

not nonresident defendants like Mr. Unterberg.

Accordingly, the Court, constrained by the plain language of § 1441(b), concludes that removal by Mr. Unterberg was appropriate.

C. <u>Attorney Fees and Costs</u>

Because the Court denies Plaintiff's motion to remand, Plaintiff's request for attorney fees and costs is likewise denied.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that removal pursuant to SLUSA was not appropriate but that removal pursuant to § 1441(b) was proper. Accordingly, Plaintiff's motion to remand is denied.

This order disposes of Docket No. 7.

IT IS SO ORDERED.

Dated: March 9, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge

14